David A. Haworth, Esquire
BALLARD SPAHR ANDREWS
  & INGERSOLL, LLP
Plaza 1000 - Suite 500
Main Street
Voorhees, NJ 08043-4636
(856) 761-3400

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **TRUMP TAJ MAHAL ASSOCIATES, LLC,** | : CIVIL ACTION<br>: NO.<br>: |
| **Plaintiff,** | : ASSIGNED TO: |
| v. | : |
| **WORLD PRODUCTIONS, LLC,** | : |
| **Defendant.** | : |

### COMPLAINT

Plaintiff, Trump Taj Mahal Associates, LLC ("Trump"), by its counsel, for its complaint against defendant, World Productions LLC ("World"), avers as follows:

### INTRODUCTION

1. This is an action under the federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, to declare the rights and legal relations of the parties under a contract to be performed in and governed by the laws of the State of New Jersey. Having failed and/or refused to perform as required, World has adopted an interpretation of the contract contrary to its terms and retained litigation counsel in California in an effort to extract from Trump additional sums to which World is not entitled and to retain certain advances that World has not earned.

DMEAST #9613373 v3

Accordingly, there exists an actual controversy as to which Trump is constrained to seek declaratory and other relief from this Court.

## PARTIES

2. Trump is a limited liability corporation existing under and by virtue of the laws of the State of New Jersey, with its principal offices at 1000 Boardwalk, Atlantic City, New Jersey 08401. At all relevant times, Trump has owned and operated the Trump Taj Mahal Casino Resort (the "Trump Taj Mahal") in Atlantic City, New Jersey.

3. World is a limited liability corporation existing under and by virtue of the laws of the State of California, with its principal offices at 13935 Tahiti Way, Suite 137, Marina Del Rey, California 90292. At all relevant times, World has been engaged in producing music television specials, including the "Decades Rock Live!" series on the VH1 Classic cable television network.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), and venue exists in this district pursuant to 28 U.S.C. § 1391(a)(2).

## RELEVANT FACTS

A. **The Parties' Agreement**

5. On or about February 23, 2005, Trump and World entered into a written agreement (the "Agreement") pursuant to which World was to produce 12 concert events (the "Concerts") at the Trump Taj Mahal for broadcast as individual television programs (the "Programs") on the VH1 Classic cable television network in accordance with certain contractual requirements. A copy of the Agreement is annexed hereto as Exhibit A.

1. **The Requirement For A So-Called "A" Artist For Each Concert**

6. One of the contractual requirements is that each and all of the Concerts feature "three (3) mutually approved musical artists," specifically comprising "one so-called 'A' Artist, one so-called 'B' Artist and one so-called 'C' Artist, such 'ranking' being based upon the party's perceived stature of the Artist in the music industry at present." (Agreement at 1.) Exhibit A to the Agreement, entitled "Mutually Approved Target Artists," lists 167 artists, of whom 51 are ranked as "A" artists, 62 are ranked as "B" artists and 54 are ranked as "C" artists.

7. World does not have discretion under the Agreement to forego an "A" artist for any of the Concerts. In this context, the Agreement provides that:

> World shall use reasonable efforts to engage one such 'A', one such 'B' and one such 'C' Artist to appear in each Program; provided that, subject to any rights of approval that VH1 Classic may have, World's good faith business decision reached in meaningful consultation with Trump as to the Artists to appear at any Concert and in any Program shall be determinative (*provided that each Program contains the performances of an 'A' Artist*, 'B' Artist and 'C' Artist" . . .).

(Agreement at 1 (emphasis added).)

8. The foregoing language makes clear that, irrespective of any "reasonable efforts" or "good faith business decision" by World, each Program *must* contain the performance of an "A" artist. Moreover, since each Program is derived from an individual Concert (*see* Agreement at 1), it is necessarily the case that World *must* furnish an "A" artist for each and every Concert.

2. **The Requirement That All 12 Concerts Be Scheduled By December 31, 2006**

9. Separate and distinct from the requirement that each Concert feature one "A" artist, one "B" artist and one "C" artist, the Agreement also mandates that all 12 Concerts be scheduled before December 31, 2006. Thus, the Agreement unequivocally provides that the

Concerts "*shall be scheduled* during the period from June, 2005 through December, 2006," which is defined as the "Initial Term" of the Agreement. (Agreement at 2 (emphasis added).)

10. Consistent with this requirement, Exhibit B to the Agreement, entitled "Schedule of Mutually Approved Tentative Concert Dates," lists 15 dates during the period between May 13 and December 2, 2005.

11. That all 12 Concerts are required to be scheduled during the Initial Term ending December 31, 2006 is further evidenced by the voluntary renewal provisions of Section XI of the Agreement.

12. Section XI provides for, but does not require, an extension of the term of the Agreement for two consecutive "Option Periods" of 19 months and 18 months, respectively, "upon all of the same terms, provisions and conditions of this Agreement, except as modified to reflect the new time periods during which the Concerts shall be held and Programs produced." (Agreement § XI at 20-21.) Section XI further provides:

> The party desiring to enter into good faith negotiations to extend the term of this Agreement shall give the other party written notice not later than thirty (30) days following the Concert date applicable to the ninth (9th) in order of the twelve (12) Concert events that are the subject of the "Series" that is in production during the "Period" of this Agreement that is then in effect, and good faith negotiations shall thereafter ensure [sic] for a period of thirty (30) days (the "Negotiation Period").

(*Id.* at 21.)

13. As evidenced by the foregoing language from Section XI, the parties intended and understood that World was to produce 12 Concerts during the Initial Term of the Agreement ending December 31, 2006, with any negotiations to renew the Initial Term to commence no later than 30 days following the ninth of the 12 Concerts.

### 3. The Contractual Payment Provisions

14. In consideration for World's timely production of 12 Concerts, each featuring one "A" artist, one "B" artist and one "C" artist, Trump agreed to pay World a total "Production Fee" of $8.4 million to be allocated equally among the 12 Concerts in the amount of $700,000 per Concert. (Agreement § I(2) at 2.)

15. Thus, with respect to the Production Fee, the Agreement provided that:

> Trump shall pay World an amount equal to One Million Dollars Seven Hundred And Fifty Thousand Dollars ($1,750,000.00) within ten (10) days of the execution of this Agreement (the "ADVANCE"). The amount of the ADVANCE shall be "amortized" over World's cost of Program production during the course of the twelve individual Programs, and deducted from the otherwise applicable "per Program" production costs, at the rate of One Hundred Forty-Five Thousand Eight Hundred and Thirty-Three Dollars and Thirty-Three Cents ($145,833.33) per Program. The remaining balance of the Production Fee in the amount of Six Million Six Hundred and Fifty Thousand Dollars ($6,650,000.00) shall be paid to World in twelve (12) equal installments of Five Hundred Fifty-Four Thousand One Hundred and Sixty-Six Dollars and Sixty-Six Cents ($554,166.66) by means of bank wire transfer to an account designated by World not later than 60 days prior to each scheduled Concert date.

(Agreement § I(2) at 2.)

16. Section I(2) of the Agreement thus manifests the intent and understanding of the parties that: (i) World is required to produce 12 Concerts at a price to Trump of $700,000 per Concert, with a portion thereof ($145,833.33) having been paid as an "advance" and the balance ($554,166.66) due 60 days prior to each scheduled Concert date; and (ii) the "Advance" paid by Trump is to be amortized over the 12 required Concerts and is not earned by World until each such Concert is produced.

### 4. The Requirement For 60 Days' Notice Of The Featured Artists For Each Concert

17. Just as Trump is obligated to pay the balance due World for each Concert 60 days in advance of the scheduled Concert date, the Agreement requires that World, for its part:

> use reasonable efforts ... to confirm to Trump the identity of the "A", "B" and "C" Artists that will be featured in each such applicable corresponding Program not later than sixty (60) days prior to the Concert date concerned, and, concurrently with the giving of such notices, to provide Trump with Artist-approved names, likenesses, images, biographical materials, logos, trademarks and the like (collectively "Artist Identifications") for Trump's use in advertising, marketing and promoting the Concerts at which the applicable Artists are to perform.

(Agreement § II(11) at 13.)

18. These contemporaneous 60-day deadlines manifest the intent and understanding of the parties that, 60 days before each scheduled Concert: (i) World is to identify to Trump the "A," "B," and "C" artists to be featured and to provide the corresponding Artist Identifications required by Trump to market the Concert; and (ii) in return, Trump is to pay to World the balance of its Production Fee for such Concert.

### 5. Additional Relevant Provisions

19. The Agreement further provides:

> This Agreement is to be governed by and construed according to the laws of the State of New Jersey applicable to contracts performed entirely in that state. In any legal proceeding brought by one party against the other, the prevailing party will be entitled to recover from the other party its reasonable attorney's fees and other costs of suit.

(Agreement § VI(D) at 17.)

20. Section IX(B) of the Agreement provides in pertinent part that, where an "event of default" (as elsewhere defined) has occurred on the part of one party:

then the other party may give the defaulting party written notice of default, and the defaulting party shall have ten business (10) days within which to cure the alleged default. Failure to cure or make arrangements to cure the alleged default within said ten (10) business day period shall cause the Initial Term of this Agreement to terminate at the option of the non-defaulting party; provided that the obligations of the parties that, by their very nature are intended to survive termination of the Initial Term of this Agreement shall survive.

(Agreement § IX(B) at 18.)

**B.    World's Failure To Comply With Its Contractual Obligations**

21.    In violation of the Agreement, World has failed to adhere to the Schedule of Mutually Approved Tentative Concert Dates annexed as Exhibit B to the Agreement and has produced to date only seven of the 12 required Concerts. The seven Concerts were held, respectively, on August 5, September 30 and November 11, 2005, and March 10, May 19, June 23 and August 11, 2006.

22.    Further, notwithstanding the unambiguous terms of the Agreement, World failed to furnish the requisite "A" artist for three of the seven Concerts. Thus, neither the August 5, 2005 Concert, the November 11, 2005 Concert nor the June 23, 2006 Concert featured an "A" artist.

23.    Trump consented to the production of the Concerts of August 5 and November 11, 2005 and June 23, 2006 without the requisite "A" artist subject to and on the basis of World's assurances that the demographic appeal of the other featured artists for each Concert would be sufficient to compensate for the absence of an "A" artist.

24.    Contrary to World's representations, however, the other featured artists at the Concerts of August 5 and November 11, 2005 and June 23, 2006 did not possess sufficient demographic appeal to compensate for the absence of the requisite "A" artists at those Concerts. Accordingly, at a meeting between the parties on June 21, 2006, Trump expressly informed

World that under no circumstances would Trump consent to the production of any more Concerts without the "A" artist to which Trump was contractually entitled.

25. The August 5, 2005 Concert was further adversely impacted when the non-"A" featured artist, presented to Trump by World as "The Doors of the 21st Century" (featuring two of the three surviving members of The Doors), was precluded from using "The Doors" name and had to be billed instead with the unknown -- and unmarketable -- appellation of "D21C."

C. **The Present Dispute**

26. Exhibit B to the Agreement lists and expressly ranks the band Earth, Wind & Fire ("EW&F") as a "B" artist. (Agreement, Exh. B at 26.)

27. Notwithstanding the express ranking of EW&F as only a "B" artist, World -- through its principal Barry Summers ("Summers") and its representative Tisha Fein ("Fein") -- has asked Trump to agree to schedule a November 17, 2006 concert featuring EW&F as the headliner without the requisite "A" artist.

28. Consistent with the parties' June 21, 2006 meeting (*see* paragraph 24, *supra*), Trump, through its Vice President for Entertainment, Steve Gietka ("Gietka"), has repeatedly and consistently informed World that Trump need not and will not agree to schedule and to pay for the proposed November 17, 2006 EW&F Concert without the requisite "A" artist.

29. Thus, for example, Gietka informed Summers by e-mail on August 25, 2006 that "you need to confirm an 'A'" for the proposed November 17, 2006 EW&F Concert. Subsequently, by e-mail on September 6, 2006, Gietka advised Summers that "[y]our efforts should be going into booking an 'A,'" reminding Summers that "[w]e've communicated to you numerous times that we can not proceed with shows that do not fulfill contractual obligations."

30. Despite having been on written notice no later than August 25, 2006 that Trump would neither agree to nor pay for the proposed November 17, 2006 EW&F Concert without the requisite "A" artist, World has failed and/or refused to honor its contractual obligation to produce such an artist.

31. Instead, World has continued to press Trump to proceed with the proposed November 17, 2006 EW&F Concert without the requisite "A" artist for the sole stated reason that World is concerned about its own independent relationship with EW&F's manager, Irving Azoff, to whom World has apparently made a contractual commitment to proceed.

32. Thus, as Fein stated in a revealing September 2006 e-mail to Gietka, "I am cool only booking A artists *after you go with EWF* . . .", "[b]ut not going to hurt my great relationship with Irving Azoff . . ." (Emphasis added.)

33. Summers, for his part, stated in various other e-mails to Gietka during September 6-8, 2006 that "we are under contract with Azoff," "we cant [sic] afford to piss him off" and "we cannot hurt Azoff."

34. Furthermore, as manifested in Fein's reference to booking the requisite "A" artists for future Concerts, World has taken the positions in communications with Trump that: (i) the 12 Concerts required by the Agreement need not be produced within the Initial Term expiring on December 31, 2006 and (ii) World is entitled to retain in full the advance paid by Trump to be applied towards Concerts produced after the expiration of the Initial Term.

D. **The September 22, 2006 Bodell Letter**

35. Notwithstanding its own acknowledged failure and/or refusal to confirm an "A" artist for the proposed November 17, 2006 EW&F Concert, World has retained Kozberg & Bodell LLP ("Kozberg & Bodell"), a litigation firm in Los Angeles, California, to prosecute putative "claims" against Trump in this context.

36. By letter to Trump dated September 22, 2006 (the "September 22, 2006 Bodell Letter"), Gregory Bodell, a litigator with Kozberg & Bodell, accused Trump of being "in default of its obligations under the [A]greement," stating in relevant part:

> [A]s provided by Section IX(B), Trump has ten business days to cure such default or the agreement shall be terminated as of the close of that tenth day by its terms. By my calculation, such tenth business day will be October 6, 2006.

(September 22, 2006 Bodell Letter at 1.) A copy of the September 22, 2006 Bodell Letter is annexed hereto as Exhibit B.

37. The September 22, 2006 Bodell Letter alleges that Trump is in default of its obligations under the Agreement in two respects. First, the September 22, 2006 Bodell Letter alleges that "Trump is in default of its obligation to engage in 'meaningful consultation' with World with respect to artists identified by World for the November 17, 2006 concert to be headlined by Earth, Wind & Fire ('EWF') and Trump is unreasonably withholding approval of the artists to be engaged." (September 22, 2006 Bodell Letter at 1.)

38. Second, the September 22, 2006 Bodell Letter states that "Trump also is in default of its obligations under Section I(2) to pay to World the Production Fee installment of '$554,166.66 by means of a bank wire transfer' to World's designated bank account 'not later than 60 days prior to' the November 17, 2006 concert to be headlined by EWF." (September 22, 2006 Bodell Letter at 1.)

39. The September 22, 2006 Bodell Letter further states that World, *inter alia*, "continues its efforts to schedule artists for the November 17, 2006 concert to be headlined by EWF," "gives notice that it will hold Trump responsible for any damages caused by Trump's default" and "will take appropriate action" absent a "cure" by Trump of the alleged "default." (September 22, 2006 Bodell Letter at 1-2.)

40. Simply stated, the September 22, 2006 Bodell Letter threatens that, unless Trump consents to the production of the proposed November 17, 2006 EW&F Concert without the requisite "A" artist and pays to World an additional $554,166.66 therefor by October 6, 2006, World will terminate the Agreement, retain the unearned portion of the advance and "take appropriate action" against Trump for "damages" through its California litigation counsel.

41. By letter dated October 6, 2006 (the "October 6, 2006 Pickus Letter"), Trump, through its Vice President of Legal Affairs Loretta Pickus, formally rejected the unreasonable and baseless demands set forth in the September 22, 2006 Bodell Letter. A copy of the October 6, 2006 Pickus Letter is annexed hereto as Exhibit C.

## CLAIM FOR DECLARATORY RELIEF

42. Paragraphs 1 through 41 of this Complaint are incorporated herein by reference.

43. The Agreement requires that World produce 12 concerts, each featuring an "A" artist, within the Initial Term ending December 31, 2006. (Agreement at 1-2, § XI at 20-21, Exhs. A and B at 25-29.)

44. The $8.4 million Production Fee owed to World under the Agreement is divided into increments of 1/12 (or $700,000), each of which is only due and payable upon World's timely production of a Concert featuring an "A" artist. (Agreement § I(2) at 2.)

45. To date, World has produced only seven of the requisite 12 Concerts, three of which lacked an "A" artist, and has failed and/or refused to retain an "A" artist for any proposed additional Concert during the Initial Term.

46. Notwithstanding the foregoing, World takes the position that it has an indefinite period of time to produce the remaining five Concerts and that no such Concert need include an "A" artist to satisfy the Agreement.

47. World has proposed to produce the eighth of the 12 required Concerts on November 17, 2006.

48. In order for the proposed Concert to be scheduled on November 17, 2006, the Agreement required that World: (i) retain an "A" artist; and (ii) "use reasonable efforts . . . to confirm to Trump the identity" of such "A" artist and provide to Trump the requisite Artist Identifications for marketing "not later than sixty (60) days prior to the Concert date concerned," *i.e.*, not later than September 18, 2006. (Agreement at 1; *id.* § II(11) at 13.)

49. World has failed and/or refused to retain an "A" artist, to confirm to Trump the identity of any such "A" artist or to provide to Trump Artist Identifications for any such "A" artist for the proposed November 17, 2006 Concert. Instead, World has retained the "B"-ranked EW&F as its proposed November 17, 2006 headliner based upon World's independent relationship with and commitment to EW&F's manager.

50. Absent the requisite "A" artist, and in view of its previous negative experience in consenting to the production of a Concert without such an artist, Trump has neither a contractual obligation nor a business justification to agree to or to pay for the production of the proposed November 17, 2006 EW&F Concert.

51. Notwithstanding the foregoing, World, through its California litigation counsel, has demanded that Trump agree to and pay for the proposed November 17, 2006 EW&F Concert by October 6, 2006, or World will terminate the Agreement, retain the unearned portion of the advance and "take appropriate action" against Trump for "damages."

52. There exists an actual controversy between the parties that is appropriate for declaratory relief.

WHEREFORE, Trump respectfully requests that this Court enter a final judgment: (i) declaring that the Agreement requires that World produce 12 Concerts, each featuring an "A" artist, within the Initial Term ending December 31, 2006; (ii) declaring that Trump has no obligation to agree to or to pay for the proposed November 17, 2006 EW&F Concert or any other future Concert in the absence of an "A" artist; (iii) declaring that World is not entitled to retain that portion of Trump's $1.75 million advance that has been allocated to Concerts that are not produced during the Initial Term of the Agreement; (iv) awarding Trump its reasonable attorney's fees and other costs of suit under Section VI(D) of the Agreement; and (v) otherwise awarding Trump its attorney's fees and costs, together with such other and further relief as the Court may deem just and equitable.

Dated: October 6, 2006

David A. Haworth, Esquire
BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
Plaza 1000 - Suite 500
Main Street
Voorhees, NJ 08043-4636
(856) 761-3400

Raymond A. Quaglia, Esquire
BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
(215) 665-8500

## CERTIFICATION REGARDING OTHER PROCEEDINGS AND PARTIES

I certify pursuant to Local Rule 11.2 of the United States District Court for the District of New Jersey, that the matter in controversy is not presently the subject matter of any other pending proceedings in any court or pending arbitration or administrative proceeding and no such other proceedings or arbitration is contemplated nor is counsel aware at this time of any other pending party who should be joined in this action.

Dated: October 6, 2006

David A. Haworth, Esquire
BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
Plaza 1000 - Suite 500
Main Street
Voorhees, NJ 08043-4636
(856) 761-3400